J-A04040-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| SANDRA RUTKOWSKI, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| CHARLES W. STENGER, | |
| Appellee | No. 506 WDA 2015 |

Appeal from the Order March 4, 2015
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD09-001894-017

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and SHOGAN, J.

MEMORANDUM BY SHOGAN, J.:                          **FILED MAY 3, 2016**

Appellant, Sandra Rutkowski, appeals from the order entered on March 4, 2015, in the Allegheny County Court of Common Pleas declaring that no common law marriage existed between Appellant and Appellee, Charles W. Stenger.  We affirm.

Appellant and Appellee met in 1987, and the parties lived together from 1987 to 2009.  When the parties' relationship ended, Appellant filed a complaint in equity and breach of contract seeking a division of shared assets.  Complaint, 4/9/10, at 4-10.  The parties filed numerous pleadings over the next three years.  On January 28, 2014, Appellee filed a motion to transfer this matter to the Family Division of the Allegheny County Court of Common Pleas, and Appellee's motion was granted in an order filed that same day.  In August 2014, Appellee filed a petition for declaratory

judgment pursuant to 23 Pa.C.S. § 3306, requesting that the trial court find no common law marriage existed. At a hearing held on February 24, 2015, the parties offered conflicting testimony regarding the existence of a common law marriage. Following the hearing, the trial court found Appellee's testimony to be credible and Appellant's testimony to be incredible. On March 4, 2015, the trial court filed an order in which it concluded that "no common law marriage ever existed between the parties." Order, 3/4/15. This timely appeal followed.

On appeal, Appellant presents the following issue for this Court's consideration:

> Whether the trial court erred and abused its discretion in its determination that no common law marriage existed between the parties when clear and convincing evidence was presented that both parties had capacity and gave present intent to marry in 1987 as well as supporting evidence of decades of continuous cohabitation and general reputation as a married couple?

Appellant's Brief at 5. Our standard of review in such matters is well settled:

> In reviewing a declaratory judgment action, we are limited to determining whether the trial court clearly abused its discretion or committed an error of law. If the trial court's determination is supported by the record, we may not substitute our own judgment for that of the trial court. The application of the law, however, is always subject to our review.

***Vignola v. Vignola***, 39 A.3d 390, 393 (Pa. Super. 2012) (citation omitted).

The trial court addressed common law marriage principles and Appellant's claim of error as follows:

In Pennsylvania, marriage is a civil contract that can be formed either by ceremony or common law. *Staudenmayer v. Staudenmayer*, 714 A.2d 1016, 1019 (Pa. 1998).[1] It has long been established that a common law marriage can only be created "by an exchange of words in the present tense, spoken with the specific purpose that the legal relationship of husband and wife is created by that." Id. at 1020. The Pennsylvania Supreme Court has stated that common law marriages should be viewed with "hostility" and are "tolerated, but not encouraged." Id. at 1019. The Supreme Court has explained that courts should treat common law marriages as hostile "because claims for the existence of a marriage in the absence of a certified ceremonial marriage present a fruitful source of perjury and fraud." Id.

[1] The Pa. Act 2004-144 abolished common law marriages contracted after January 1, 2005. [Appellant] asserted that the common law marriage was formed in November 1987. Thus, the issue was ripe for adjudication.

Regarding what constitutes a sufficient exchange of words to form a common law marriage, the Pa Supreme Court has explained:

> It is too often forgotten that a common law marriage is a marriage by the express agreement of the parties without ceremony, and almost invariably without a witness, by words - not in future or in *postea*, but - *in praesenti*, uttered with a view and for the purpose of establishing the relationship of husband and wife.
>
> The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time.
>
> The burden to prove the marriage is on the party alleging a marriage, and we have described this as a "heavy" burden where there is an allegation of a common law marriage.

- 3 -

When an attempt is made to establish a marriage without the usual formalities, the claim must be reviewed with great scrutiny.

[*Staudenmayer*, 714 A.2d] at 1020-22.

In other words, a common law marriage does not come into existence unless the parties uttered the *verba in praesenti*, meaning the exchange of words in the present tense for the purpose of establishing the relationship of husband and wife. [*Staudenmayer*, 714 A.2d] at 1021. A rebuttable presumption may be entered in favor of a common law marriage based on sufficient proof of cohabitation and reputation of marriage where the parties are otherwise disabled from testifying regarding *verba in praesenti*. Id. Where the parties are available to testify, however, the party claiming a common law marriage bears the burden of producing clear and convincing evidence of the words exchanged. Id.

The credibility of the witnesses in this particular case holds great significance as so much of the testimony presented was contradictory. It is within the sole province of the trial court to assess the credibility of witnesses. *McKolanis v. McKolanic*, 644 A.2d 1256, 1257 (Pa. Super. Ct. 1994). This means that "the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." *In re B.C.*, 36 A.[3]d 601, 605 (Pa. Super. Ct. 2012).

Both parties were available to testify in this case. [Appellant] testified that she first met [Appellee] in August 1987. Then in November 1987, [Appellant] stated that she and [Appellee] discussed their future together. [Appellant] testified that the parties agreed to be married while [Appellee] attempted to get an annulment from his previous marriage. [Appellant] stated that they celebrated this discussion by sharing a bottle of wine.

On the contrary, [Appellee] testified that there was never a discussion about pledging themselves to each other. [Appellee] acknowledged that he loved [Appellant], but they never discussed marriage. The Court finds [Appellee's] testimony on this issue to be credible.

The parties did live together. During that time, the parties shared in entertaining and attended events together. [Appellant] testified that she told her Mother, sisters, and friends about vows that the parties exchanged. This Court finds [Appellant's] testimony on this matter not credible. [Appellant's] own family members testified that [Appellant] and [Appellee] were not husband and wife. [Appellant's] brother, Gary Rutkowski, testified that there was never a ceremony between the parties. He stated that [Appellant] and [Appellee] never appeared to be married. Rather, their relationship was more for convenience rather than commitment. Cheryl Rutkowski testified that neither party wanted to be married to the other. [Appellant's] sister, Elizabeth Griffin, stated that the parties acted like a married couple, but the [Appellant] did not tell her that they pledged themselves to be husband and wife *until years later*.

[Appellant] testified that in September 1988, the parties bought wedding bands in the Caribbean. On cross-examination, however, [Appellant] admitted that the wedding band receipt lists [Appellant's] sister's name. [Appellant] stated that [Appellee] later bought [Appellant] a diamond ring, but she sold it because she needed money.

[Appellant] was listed as [Appellee's] common law spouse on [Appellee's] insurance. [Appellee] testified that [Appellant] was put on his insurance and other documents so that she could build up her credit. There was conflicting testimony as to whether the parties also accrued a vehicle jointly. Eventually, the parties ventured into real estate in order to make money as landlords. When the properties were purchased, however, they were only in [Appellee's] name. In fact, all six of the properties that were discussed by [Appellant] were titled solely in [Appellee's] name. [Appellant] acknowledged that [Appellee] is listed as "unmarried" on all of the deeds. Additionally, a deed transferred between the parties reflects that a transfer tax was paid. [Appellant] testified that she did not know that married couples were not required to pay transfer tax when they moved property between each other despite the fact that [Appellant] herself is a real estate agent. Of further significance is the fact that all of [Appellee's] tax returns for the period in question list [Appellee] as single, unmarried.[2]

<sup></sup>² From 1994 through 2010, [Appellee] filed his taxes as single, unmarried. Then from 2011 through 2014, [Appellee] filed as "married" as he had married Shirley Stenger in October 2011.

[Appellant] stated that the parties presented themselves as husband and wife. [Appellee] stated, however, that he never introduced [Appellant] as his wife. The Court finds [Appellee's] testimony on this issue to be credible. It is supported by the fact that the plethora of cards and love letters exchanged by the parties never referenced each other as husband or wife. Some of the letters were short insignificant exchanges while some were cards for Valentine's Day. Regardless of the occasion or content in the card or letter, "Husband" or "Wife" was never referenced by either party.

Further, despite [Appellant's] assertions that the parties were "married," she never changed her name to Stenger. Nor did the [Appellant] change her license or other important documents to reflect [Appellee's] name.

For the aforementioned reasons, this Court finds [Appellee's] testimony to be more credible overall than [Appellant's]. This Court holds that there was no *verba in praesenti*; the parties never exchanged words in the present tense for the purpose of establishing the relationship of husband and wife. Further the evidence submitted to the Court supports [Appellee's] testimony that the parties did not enter a common law marriage. [Appellant] had a heavy burden to overcome and she failed to do so through the testimony and evidence presented.

Trial Court Opinion, 5/6/15, at 2-6 (emphasis in original).

After careful review, we discern no error. Both parties were able to testify, and Appellant was required to prove that words in the present tense establishing the intention to be husband and wife were exchanged. In her brief on appeal, Appellant focuses on the trial court's explanation regarding tax returns, real estate holdings, and the fact that Appellant did not take

Appellee's last name.[1]   We conclude that the trial court thoroughly addressed the arguments made by Appellant, and we agree that Appellant's claims of error entitle her to no relief.

However, one aspect of Appellant's argument the trial court did not address in detail was a letter Appellee wrote to Appellant during their relationship.  Appellant argues that the letter reveals the existence of the parties' common law marriage.  We disagree.

During the February 24, 2015 hearing, Appellant read the letter into the record, and the letter was admitted into evidence without objection. N.T., 2/24/15, at 70-71; Exhibit CC.  The language of that letter is as follows:

> Hi [Appellant].  By now I should be in Canada, and you can be sure that I miss you.  But if I would have taken you, the guys might find out that I am a wus buck or even a wimp.  Just so you don't think so.  Well, you know what they say, something or other makes the heart grow fonder.  Ha-ha.  That's supposed to be funny.  Or should I have said ho-ho-ho?  Well, anyway, another reason I am writing this note is **if anything happens to me, I am saying that this should hold up in any court of law, that I want all of my possessions, everything that I own, all of my money, property and coins to go to [Appellant].  And if this letter isn't worth anything, how about common law in the state?  Well, I don't think anything will happen.**  I miss you and I love you with all my heart.  I will be back soon so you can sing your song again, you're a pain in my balls.  Love for ever and ever, [Appellee].

_____

[1]  While the trial court does mention that Appellant did not change her name to Stenger, Trial Court Opinion, 5/6/15, at 6, this appears in one sentence only.  We conclude that this factor is but one consideration, and ultimately, we concede it is of little significance in this Court's analysis.

N.T., Hearing, 2/24/15, at 70-71 (emphasis added).

We conclude that the letter may have been an attempt to draft a holographic will or perhaps a rhetorical question regarding common law marriage; however, it cannot be construed as *verba in praesenti* such that it establishes a marriage at common law. Indeed, the only mention of "common law" is phrased as a question—it is not a statement of fact or demonstration of the parties' then-existing circumstances. After reviewing the letter, we do not discern any abuse of discretion or error of law in the trial court's conclusion.

For the reasons set forth above, we conclude that Appellant is entitled to no relief. Accordingly, we affirm the March 4, 2015 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/2016